### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | **CRIMINAL NO. 11-119** |
| | \* | |
| **VERSUS** | \* | **SECTION "E" (5)** |
| | \* | |
| **CHRISTOPHER DORSEY** | \* | |
| | \* | |
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* | \* | |

### RESPONSE TO MOTION FOR RULE TO SHOW CAUSE WHY THE DEFENDANT'S SUPERVISED RELEASE SHOULD NOT BE MODIFIED

COMES NOW, Defendant, Christopher Dorsey, through his undersigned counsel, and respectfully submits this Memorandum in Response to Motion for Rule to Show Cause Why the Defenant's Term of Supervised Release Should Not Be Modified.

### INTRODUCTION AND BACKGROUND

When Mr. Dorsey was initially arrested for the charges giving rise to this case, he was a successful music artist.  He was young and did engage in criminal activity. He accepted responsibility and served his long prison sentence (including a successful term at the half-way house).  He now lives a completely law-abiding life in a suburban neighborhood.  Significantly, it must be noted for the purposes of the Government's Motion, that his present music is not connected to any personal misconduct or criminal activity.

As previously set forth in Mr. Dorsey's Memorandum filed on April 5, 2024 (ECF 173) in anticipation of the last court appearance (and as set forth below), it is respectfully submitted that Mr. Dorsey has not violated the terms of his supervised release. Besides the government's concerns with certain lyrics in Mr. Dorsey's songs, it is respectfully submitted that Mr. Dorsey has remained compliant and is he is sincerely dedicated to successfully completing his term of supervised release and being a productive member of society.

The government notes in its Memorandum:

> However, the Court should be aware that when Mr. Dorsey appeared for his initial appearance in this matter on April 8, 2024, he and his attorneys voluntarily met with the undersigned Assistant United States Attorney and had a positive and frank discussion about the Government's concerns, which are included in this motion. ***It was the undersigned AUSA's opinion that Mr. Dorsey was courteous and sincere during this meeting and in his desire to comply with the requirements of his supervised release.***

*See* ECF 180, p. 7, n. 7 (emphasis added).  On March 27, 2024, at the initial appearance hearing in the District of Nevada, the government noted on the record that "[t]here appears to be a communication lapse between the Court and the supervising office here in that Mr. Dorsey was granted authority from the Probation Office here to perform in some of these instances mentioned in the petition.  We expect that that will be ironed out down in Louisiana."  *See* Exhibit 1, March 27, 2024 tr. at p. 6 (emphasis added).  The government also noted "And Officer Sones also reported – which I should have provided Your Honor up front – Mr. Dorsey has been very compliant on supervision.  There have not been issues of lack of communication or unresponsiveness.  They believe that he is responsive to conditions."  *See id.* at p. 7 (emphasis added).

Accordingly, it is evident that Mr. Dorsey has been responsive and compliant with supervision.  Mr. Dorsey sincerely seeks to continue to follow this Honorable Court's orders and to better himself.  He also seeks to be permitted to engage in his music business endeavors which can lawfully support himself and his family.   Here, it is respectfully submitted that the Government's Motion conflates Mr. Dorsey's words with his actions. Contrary to where the Motion states that "Unfortunately, the kind words mentioned above [from Ronald Williams] are a far cry from what Mr. Dorsey is actually doing", there is nothing to suggest that Mr. Dorsey has participated in any activities that could ever remotely be deemed criminal or even outside the

acceptable norms of society. The Government cannot equate the lyrics of a song to "getting back into the same lifestyle."

While context is important in how things are viewed, it appears that the Government is failing to look at the facts of Mr. Dorsey's current life, but rather is still focusing on his previous one. Mr. Dorsey's relocation to Las Vegas has kept him away from New Orleans and from the very influences that the Government alludes to. The Government writes that "Mr. Dorsey's conduct directly contradicts the goals of supervised release – rehabilitation and becoming a responsible law-abiding member of our community." The Government cites his "continued praise of drug dealers who have murdered numerous people in this city, and his continued threat to those who have cooperated with law enforcement." Here, Mr. Dorsey's music is self-expression and his lyrics do not rise to the level of illegal or criminal activity.

Mr. Dorsey is doing all the things that would be expected of a person in his position – he attends all his classes, he attends all his meetings, he has volunteered to work with other convicted felons to help them make their lives better. The actions the Government complains of – self-employment and improper association – are actually reflections of Mr. Dorsey's attempt to do what is most required of him – earn a living to support himself and his dependents and live up to his financial obligations to pay taxes.  For example, the fact that Mr. Dorsey made a record with famed recording artist, Gucci Mane – who has a criminal past – was not an effort to participate in any nefarious or criminal activity, but rather to create music that would help him bring his career to a successful place (the actual song was recorded remotely and they were not in the same studio). *See infra*. As stated below, with the exception of one song, Really Understand (which had a positive message), the recently posted songs were for promotional purposes and <u>he did not receive any</u>

compensation.  To say that Mr. Dorsey is "not taking his rehabilitation seriously" is an affront to the very concept that as an artist he should be allowed to express himself without fear of retribution.

There is also the matter of the pending business that the Government alludes to. The Government's assertion that "the desire to make money is understandable, …[but] is not the purpose of supervised release" is misplaced. The very purpose of supervised release is for the felon to return to society as a productive and contributing member (to be able to support himself without aid from the government or charity and to be able to sustain a viable and respectable career). That is exactly what Mr. Dorsey has done. He has handled his business with the utmost integrity and care. He is not making money by violating any state or federal law.

As recognized by the Government, before the Petition for Warrant or Summons for Offender Under Supervision was submitted (March 21, 2024), undersigned counsel was planning on filing the attached draft Motion to Approve Self-Employment (attached hereto as Exhibit 2), and counsel were in discussions with AUSA Maurice Landrieu regarding the same.  This is acknowledged by the Government in its Motion.  ECF 180, at p. 2, n. 2 ("The Court should be aware that prior to U.S. Probation filing the current petition for revocation, Mr. Dorsey's attorneys reached out to the undersigned AUSA, on or about April 1, 2024, to clarify Mr. Dorsey's working conditions.").  Accordingly, Mr. Dorsey and his counsel have recently been proactive in addressing his employment conditions with the court (the sentencing was approximately 12 years ago).

Here, the Government has now requested that Mr. Dorsey's supervised release conditions be modified and clarified.  These proposed conditions will be addressed individually, and it is respectfully submitted that proposed condition number 1 improperly infringes upon Mr. Dorsey's Constitutional right to free speech under the First Amendment.

## **GENERAL STATEMENT OF LAW**

Content-based speech restrictions (that is, restrictions which permit a defendant to say X, but not Y) are presumptively violative of the First Amendment. Thus—citing Supreme Court precedent—the Fifth Circuit has explained:

> "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)). The First Amendment's protections apply to jokes, parodies, satire, and the like, whether clever or in poor taste. *See, e.g., Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54 (1988).
>
> That said, the First Amendment does not protect all speech, nor has it ever. "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571–72 (1942). "Content-based *restrictions* on speech have been permitted, as a general matter, only when confined to the few historic and traditional categories of expression long familiar to the bar." *Alvarez*, 567 U.S. at 717. Two categories are relevant here: (1) "advocacy intended, and likely, to incite imminent lawless action;" and (2) "true threats." *Id.* (citing *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Watts v. United States*, 394 U.S. 705 (1969)).

*Bailey v. Iles*, 87 F.4th 275, 283 (5th Cir. 2023).

A prior restraint is defined as a "judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression" *See United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (defining). And there is "a heavy presumption against [the] constitutional validity" of "[a]ny imposition of a prior restraint." *Id.* at 310 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)). Courts have thus vacated overly broad conditions of supervised release implicating First Amendment rights. *See, e.g.*, *United States v. Bolin*, 976 F.3d 202, 214 (2d Cir. 2020) (vacating as unconstitutional condition of supervised release prohibiting

defendant from engaging in internet speech "that promotes or endorses violence, unlawful activity, or any groups that espouse such ideas"). In *Bolin*, the Second Circuit Court of Appeals found:

> A defendant does not surrender all his constitutional rights as he enters a prison door to serve his term of incarceration; less so as he exits it on supervised release. It is thus undisputed — indeed beyond dispute — that a person on supervised release retains some First Amendment rights...

*Id.* With these general principles in mind (and, mindful that no evidence shows that the mere performance of rap music is "likely" to "incite imminent lawless action," *Bailey*, 87 F.4th at 283), the specific role of supervised release can be explored.

Title 18, section 3583(d) provides in part that, in addition to general conditions of supervised release, a court may also impose special conditions "to the extent that such [special] condition . . . (2) involves *no greater deprivation of liberty than is reasonably necessary* for the purposes set forth in section 3553(a) . . . ." *Id.* (emphasis added). In 18 U.S.C. § 3583, Congress authorized district courts to impose limited terms of supervised release, depending on the crime for which the defendant was convicted. Congress listed certain mandatory conditions for supervised release and authorized district courts to impose other appropriate conditions. However, Congress mandated that:

> Written statement of conditions.—The court shall direct that the probation officer provide the defendant with a written statement that sets forth all the conditions to which the term of supervised release is subject, and that is sufficiently clear and specific to serve as a guide for the defendant's conduct and for such supervision as is required.

18 U.S.C. § 3583(f). As Congress required, conditions of supervised release must be "sufficiently clear and specific to serve as a guide for the defendant's conduct and for such supervision as is required." *Id.* "If a condition, however well-intentioned, is not sufficiently clear, it may not be imposed." *United States v. Reeves*, 591 F.3d 77, 80 (2d Cir. 2010). "Due process requires that [a] condition[] of supervised release be sufficiently clear to give the person of ordinary intelligence a

reasonable opportunity to know what is prohibited, so that he may act accordingly." *United States v. Simmons*, 343 F.3d 72, 81 (2d Cir.2003) (internal quotation marks omitted).  The Fifth Circuit thus explains that:

> [S]pecial conditions of supervised release are evaluated to determine if they are reasonably related to four different factors: (1) "the nature and circumstance of the offense and the history and characteristics of the defendant," (2) the need "to afford adequate deterrence to criminal conduct," (3) the need "to protect the public from further crimes of the defendant," and (4) the need "to provide the defendant with needed [training], medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(1)-(2) (1994).

*United States v. Paul*, 274 F.3d 155, 170 (5th Cir. 2001).

Release conditions restricting speech are "classic examples of prior restraints" because they "actually forbid speech activities" before they occur. *Alexander v. United States*, 509 U.S. 544, 550 (1993). Ordinarily, such prohibitions would be considered "unconstitutional restraint[s] upon publication." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 723 (1931). In the supervised release context, however, conditions restricting speech may be valid prior restraints only when narrowly tailored and reasonably related to deterrence and rehabilitation. *United States v. Turner*, 44 F.3d 900, 903 (10th Cir. 1995); *United States v. Nu-Triumph, Inc.*, 500 F.2d 594, 596 (9th Cir. 1974). The Court must ensure that conditions do not impose an "overly broad prior restraint upon speech, lacking plausible justification." *Tory v. Cochran*, 544 U.S. 734, 738 (2005).

Here, given that Mr. Dorsey is living a crime free life and his lyrics are therefore fiction, any restriction on speech would be outside of the permissible scope of 18 U.S.C. § 3553(a).In addition to the foregoing, if modified conditions of release are imposed, a defendant has a "due process right to conditions of supervised release that are sufficiently clear to inform him of what conduct will result in [the defendant] being returned to prison." *Id.* (internal quotation marks omitted).

As the United States Court of Appeals for the Fifth Circuit in *United States v. Paul* recognized: "Restrictions on an offender's ability to interact with particular groups of people, to hold certain types of employment, and to frequent certain places must provide 'fair notice' of the prohibited conduct." 274 F.3d 155, 166 (5th Cir. 2001) (citing *United States v. Loy*, 237 F.3d 251, 262 (3d Cir. 2001) (noting that the same principles of due process and notice that apply to criminal statutes apply to supervised release conditions). "The sentencing court has an obligation to express its sentences in clear terms to reveal with fair certainty its intent." *United States v. Patrick Petroleum Corp. of Michigan*, 703 F.2d 94, 98 (5th Cir. 1982); *accord United States v. Taylor*, 973 F.3d 414, 421 (5th Cir. 2020) ("Criminal sentences must reveal with fair certainty the intent of the court."); *see also United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002) ("A probationer ... has a separate due process right to conditions of supervised release that are sufficiently clear to inform him of what conduct will result in his being returned to prison."). Where this obligation has not been met, it may be "in the interest of judicial economy and fairness to all concerned parties that we remand for clarification of the sentence." *Patrick Petroleum Corp. of Michigan*, 703 F.2d at 98; *accord United States v. Juarez*, 812 F.3d 432, 437 (5th Cir. 2016) (finding a sentence was "unclear or ambiguous" and therefore "vacat[ing] and remand[ing] for clarification in the interest of judicial economy and fairness to all concerned parties"); *United States v. Garcia–Ortiz*, 310 F.3d 792, 795 (5th Cir. 2002) ("In light of the ambiguity in the record, the best course is to remand the case for reconsideration of the sentence."). *See also, e.g., United States v. Nunley*, No. 21-50572, 2022 WL 16948571, at *3 (5th Cir. Nov. 15, 2022) (unpublished). This is why before an arrest warrant was issued, his counsel was in discussions with the Government counsel and planning to file with the Court, clarification of his work condition (Special Condition No. 5).

## GOVERNMENT'S PROPOSED CONDITIONS

**GOVERNMENT'S PROPOSED CONDITION NO. 1.**

> 1) Dorsey shall provide his U.S. Probation Officer with a written copy of the lyrics of every song that he has written, in whole or in part, since being released from the Bureau of Prisons or for any song that he may write, in whole or in part, while on supervised release. The lyrics of these songs will be kept by U.S. Probation to monitor Dorsey's work and will not be released to or made available to the public by U.S. Probation, to safeguard against any copyright infringements, without Dorsey's consent or a court order. However, U.S. Probation will provide the government with a copy of the lyrics.

As to Government's proposed condition number 1, this Honorable Court has ordered that Mr. Dorsey "submit to the Court the lyrics to all songs the Defendant has recorded since his release from imprisonment on January 24, 2024." *See* Order, ECF 184. Those lyrics are being provided to the Court under seal as Exhibit 15 to the instant motion. As to the Government's request for Mr. Dorsey to provide U.S. Probation (and the government) with lyrics "*for any song that he may write, in whole or in part*, while on supervised release," it is respectfully submitted that this request is overly broad and violates the First Amendment and due process. (emphasis added). It is respectfully submitted that requiring Mr. Dorsey to submit his mental impressions and lyrics for *any song that he may write, whole or in part*, would constitute a prior restraint. It is respectfully submitted that Mr. Dorsey should be permitted to write and express his own thoughts without fear that he needs to provide all lyrics to U.S. Probation and the Government. *See also infra.*

Here, this proposed condition is also unnecessary considering Mr. Dorsey's music background and history as a music artist. Furthermore, the proposed condition would violate equal protection. Besides Mr. Dorsey, are there any other music artists on supervised released in this District or throughout the United States being required to submit all of their song lyrics to U.S. Probation and the Government? Significantly, Mr. Dorsey's song lyrics have not resulted in any criminal activity. It is respectfully submitted that blaming someone's music for violence is like

blaming Arnold Schwarzenegger and Sylvester Stallone for violent crimes because of their movies. Furthermore, evaluating lyrics for alleged supervised release violations would result in arbitrary, vague, and subjective enforcement. Accordingly, the proposed condition as it relates to the submission of future lyrics/mental impressions should not be adopted by this Honorable Court.

As to the specific songs raised by the Government, the "Comeback Kid" and "Shake Yo Dreads" songs were freestyles[1] and were for promotional purposes only. <u>Mr. Dorsey did not receive payment for the songs</u>. Moreover, the song, "Say My Grace" was also a promotional song. The only song which Mr. Dorsey could receive any compensation is "Really Understand," and that song is a descriptive outline of Mr. Dorsey serving time in custody and has a good message. While some of the lyrics cited by the government include expletives, they are essentially hyperbole taken out of context. Mr. Dorsey has followed the law since his release and the cited lyrics are not illustrative of Mr. Dorsey's actions while on supervised release, including his charity work. *See infra.*

In *Cohen v. California*, 403 U.S. 15 (1971), a 19-year-old department store worker expressed his opposition to the Vietnam War by wearing a jacket emblazoned with "FUCK THE DRAFT. STOP THE WAR" The young man, Paul Cohen, was charged under a California statute that prohibits "maliciously and willfully disturb[ing] the peace and quiet of any neighborhood or person [by] offensive conduct." Cohen was found guilty and sentenced to 30 days in jail. In an opinion by Justice John Marshall Harlan, the Court held that the California statute violated freedom of expression as protected by the First Amendment. The Court reasoned that the expletive, while provocative, was not directed toward anyone; besides, there was no evidence that people in

---

[1]      Freestyle is a style of hip hop where an artist improvises typically with an unwritten verse from the head, with or without instrumental beats, in which lyrics are recited with no particular subject or structure. *See* https://en.wikipedia.org/wiki/Freestyle_rap

substantial numbers would be provoked into some kind of physical action by the words on his jacket. Judge Harlan recognized that "one man's vulgarity is another's lyric." In doing so, the Court protected two elements of speech: the emotive (the expression of emotion) and the cognitive (the expression of ideas). *See id.*

In *Elonis v. United States*, 575 U.S. 723 (2015), Anthony Douglas Elonis faced charges for what the prosecution considered threats to his ex-wife and co-workers. Briana Carter in "*Lyrics for Lockups: Using Rap Lyrics to Prosecute in America,*" Mercer Law Review: Vol. 69: No. 3, Article 14 wrote in part:

> The issue arose around Elonis' self-styled rap lyrics posted on Elonis' Facebook page. Elonis began making the posts after a series of events in his home and work life. Elonis took to Facebook to express his anger and frustrations with his situation using poetic rap-style posts to convey his thoughts.

> For example, he separated his sentences into stanzas, used exaggerative language, and even changed his name on Facebook to "Tone Dougie."'

> When faced with the indictment, Elonis contended that the charges against him were inappropriate because he did not actually intend to threaten his victims and that this was a violation of his First Amendment right to freedom of speech.

> While Elonis' ex-wife and former employer saw him as a threat, Elonis compared himself to Eminem. For example, Elonis wrote:

> > Fold up your [protection-from-abuse order] and put it in your pocket
> > Is it thick enough to stop a bullet?
> > Try to enforce an Order
> > [T]hat was improperly granted in the first place
> > Me thinks the Judge needs an education on true threat jurisprudence
> > And prison time'll add zeros to my settlement.

> Elonis' degrading and violent message is somewhat comparable to Eminem's discussion of his relationship with his ex-wife in various songs. For example, in the best-selling single, "Love the Way You Lie," featuring Rihanna, Eminem wrote:

> > You swore you'd never hit 'em, never do nothin' to hurt 'em
> > Now you're in each other's face
> > Spewin' venom in your words when you spit 'em
> > You push, pull each other's hair, scratch, claw, bit 'em.

> In this instance, similar to Elonis, Eminem speaks of violence and turmoil in a relationship. However, unlike Elonis, Eminem was not prosecuted for making threats or admitting to past instances of abuse. Instead, Eminem was awarded with several weeks on the Billboard Hot 100. It seems quite unfair that Eminem is allowed to use this type of lyrics to express himself while Elonis would not get the same freedom. The Supreme Court of the United States understood this point. The Court held that the rap-styled posts were not true threats because Elonis did not have the subjective intent to issue a serious threat. While Elonis' language may have been lude and vulgar, this type of speech still deserves protection, as it could lead to the elimination of an entire genre of artistic expression. Even though the problem may seem to be resolved from here, this defense would only work in instances where the defendant is being prosecuted for an actual threat. Because prosecutors have used rap lyrics for other reasons, the Supreme Court's decision has not resolved the full issue.

*See id.* at pp. 918-920. Notably, the United States Supreme Court did not specifically address the First Amendment issue related to rap lyrics being admitted against a Defendant over an objection. *Elonis v. United States*, 575 U.S. 723, 740 (2015) ("Given our disposition, it is not necessary to consider any First Amendment issues.").   Moreover, there appears to be no real clear case law related to analysis of rap lyrics for a defendant on supervised release.   While the Government's criticisms of Mr. Dorsey in this instant case appear limited to a few instances, it must be noted that under the First Amendment, "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). Therefore, speech critical of the government is "subject to the highest degree of First Amendment protection." *Wolfson v. Concannon*, 750 F.3d 1145, 1152 (9th Cir. 2014). That protection extends to "[c]riticism of those responsible for government operations . . . lest criticism of government itself be penalized." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).

In particular, the First Amendment also protects criticism of law enforcement officers. *See Rattray v. City of Nat'l City*, 51 F.3d 793, 800 (9th Cir. 1994) (police officer is public official for purposes of the First Amendment). As another court has noted:

> The cop on the beat is the member of the department who is most visible to the public. He possesses both the authority and the ability to exercise force. Misuse of his authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss. The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant the conclusion that he is a public official.

*Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981). Criticism of police officers and other public officials is often pointed and harsh. But "[t]he sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office," which "will not always be reasoned or moderate." *Hustler Mag. v. Falwell*, 485 U.S. 46, 51 (1988). The First Amendment reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times*, 376 U.S. at 270. Therefore, "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quotation marks and citation omitted).

It should be noted that certain courts have recently found the introduction of rap lyrics to be extremely prejudicial to a defendant. *See e.g., United States v. Bey*, 2017 WL 1547006 (E.D. Pa. 2017) (holding that the rap music evidence was inadmissible as unfairly prejudicial under Fed. R. Evid. 403); *United States v. Williams*, 2017 WL 4310712 (N.D. Cal. 2017); *People v. Taylor*, 2019 WL 926601 (Cal. App. 4th Dist. 2019) (unpublished); *Com. v. Gray*, 463 Mass. 731, 978 N.E.2d 543 (2012); *Hannah v. State*, 420 Md. 339, 23 A.3d 192 (2011); *People v. Foster*, 2015 WL

2412383 (Mich. Ct. App. 2015); *State v. Cheeseboro*, 346 S.C. 526, 552 S.E.2d 300 (2001).[2]

Here, Mr. Dorsey has not made any true threats, and most significantly, he has not engaged in criminal activity.  He has simply exhibited his artistic expression.  In light of the foregoing, Mr. Dorsey is hopeful that this Honorable Court can fashion a condition to permit Mr. Dorsey to engage in self-employment in the music industry, including conditions which do not require him to submit all of his song lyrics to the Government for pre-approval.

**GOVERNMENT'S PROPOSED CONDITION NO. 2.**

> 2) Dorsey shall not associate or work with anyone who has previously been convicted of a felony offense, without first obtaining written approval from this Court. It is Dorsey's responsibility to determine if any of his associates or individuals with whom he chooses to work are felons.

Here, the proposed condition should be clarified to state that Mr. Dorsey may associate and work with someone who has previously been convicted of a felony offense, for employment purposes, as many people in the entertainment industry have felonies. Mr. Dorsey will make sure to inform U.S. Probation regarding the same, and if he inadvertently meets someone who he knows is a felon, he will immediately report the interaction to U.S. Probation.

**GOVERNMENT'S PROPOSED CONDITION NO. 3.**

> 3) Dorsey shall not participate in any type of self-employment while on supervised release unless he obtains written approval of this Court.

As stated above, Mr. Dorsey has opportunities to continue to be employed in the music industry.  Mr. Dorsey, who has performed as a rapper since the age of 13, has also become an in-demand recording artist in Las Vegas, Nevada, where he now lives. Mr. Dorsey had previously

---

[2]    *See also generally, e.g.,* Reyna Araibi, *Every Rhyme I Write": Rap Music as Evidence in Criminal Trials*, 62 Arizona Law Review 805 (Fall, 2020) (Note); *see also* Carter, Briana (2018) "*Lyrics for Lockups: Using Rap Lyrics to Prosecute in America*," Mercer Law Review:  Vol. 69 : No. 3, Article 14.

been part of a historic musical legacy, the "Hot Boys", as part of the Cash Money Records family. He also had a very high profile and highly respected solo career prior to his incarceration. *See id.*

Michael Reinert of the law firm Fox Rothschild is Mr. Dorsey's entertainment lawyer and has written the Court to explain the opportunities available to Mr. Dorsey. *See* Exhibit 8.

As explained by Mr. Reinert, Mr. Dorsey has been sought out by many influential hip-hop artists, including Grammy award-winning artists such as Gucci Mane, Kevin Gates, and Finesse2. *See id.* He has also collaborated with Mike Will Made It, one of the most respected and award-winning producers of the last 10 years. *See id.* In the next six to nine months, Mr. Dorsey will have the opportunity to release two full albums on significant record labels, in addition to performing as a guest artist for others. *See id.*

Helping to manage Mr. Dorsey's career are an array of professionals, including (1) Mr. Reinert, who will handle Dorsey's legal affairs; (2) Tracey Smith, as experienced music executive who will serve as Mr. Dorsey's manager; and (3) Phil Sarna Business Management, which will handle Mr. Dorsey's finances. In addition, Mr. Reinert has been in discussions with the preeminent talent agency CAA to manage Mr. Dorsey's live performances. *See id.* Mr. Dorsey is also respected and supported in the music industry. Phil Sarna, Founder and CEO of PSBM, a business management firm specializing in the Entertainment and Sports Industries, writes in part:

> Mr. Reinert brought Mr. Dorsey to my attention a few months back. As he has done in the past, Mr. Reinert was coming to me to see if I would be a good fit for working with this client. He explained that Mr. Dorsey was living in Las Vegas under supervised release and was working on his music career. Given that there would be income created by Mr. Dorsey's activities, Mr. Reinert wanted to make sure that all of Mr. Dorsey's financial needs would be properly handled and all of his obligations timely met. My team and I worked with Mr. Reinert's office and with Tracey Smith, Mr. Dorsey's manager, to establish the proper bank accounts and obtain the necessary tax documents. Since that time, PSBM has handled Mr. Dorsey's financial business and has maintained complete and accurate records of same.

While I have only known Mr. Dorsey a short time, I do know that he has dedicated himself to being a strong and contributing member of the community. He has contributed his time to both the Emeral Dream Foundation…and Hope for Prisoners…, from where he graduated. It is clear that Mr. Dorsey takes his responsibilities, obligations and freedom very seriously.

I have worked with many performers who have, unfortunately, found themselves at times on the wrong side of the law. It is not something we cater to but it is a reality of our world. Yet I have also seen the difference between those who understand the debt they paid and must continue to pay, and those who take for granted the opportunities presented to them. I can say with great certainty that Mr. Dorsey falls squarely in the former and I know he will continue to pursue only the highest standards in his career and as a member of the community. I hope the court will find that it is in not only Mr. Dorsey's best interests but in the community's as a whole to allow him to pursue his career with the careful guidance of the court and his representatives.

Exhibit 10.   Mr. Dorsey currently has the following performing/touring opportunities available where he can perform and earn compensation:

- Essence Festival of Culture in New Orleans at the New Orleans Caesars Superdome: date: July 5, 2024;
- Live Nation, 2024 Lil WeezyAna Festival headlined by Lil Wayne: date: November 2, 2024;
- Hottest of the Hot Tour (10 shows);
- Juvenile and The 400 Degreez Band Fall Tour Dates 2024 (80 shows): dates: Fall 2024[3]

Accordingly, Mr. Dorsey is not engaging in music for criminal purposes.  He clearly can support himself with the opportunities that are being presented by the music industry.  This is an extremely fortunate position to be in.  As such, it is apparent that Mr. Dorsey has devoted himself to becoming a contributing and law-abiding citizen.

It is significant to note that while on supervised release, he has been employed with the Emerald Dream Foundation, a charitable/animal rescue organization.[4]  Specifically, Mr. Dorsey is

---

[3]      Mr. Dorsey has received offers which would need to be negotiated pending court approval.  Due to proprietary information and out of respect for privacy, additional information can be submitted under seal.
[4]      https://www.emeralddreamfoundation.org/

employed as an outreach worker.  For example, his role and responsibilities as an outreach worker include attending and participating in programs and events such as:

- Women's Empowerment with the Las Vegas Metropolitan Police Department and the Las Vegas Raiderettes;
- Shopping with inner city youth;
- Halloween Trunk or Treat with the Las Vegas Metropolitan Police Department;
- Work with Hope for Prisoners;
- Thanksgiving Turkey Giveaway - with the Las Vegas Metropolitan Police Department and Doolittle Center;
- Christmas Turkey Giveaway - with Las Vegas Metropolitan Police Department and Doolittle Center,
- Christmas with Santa event – Doolittle Center.

His employer provides his employment information on a regular basis including timesheet, paycheck, and paycheck stub. *See, e.g.*, Exhibit 6.

Lana Fuchs, President/CEO of the Emerald Dream Foundation writes in part:

I am writing to you on behalf of Christopher Dorsey, who, after serving a 13-year sentence, has been a beacon of positive change and an exemplary member of our community. It is my hope that through this letter, I can convey the depth of his transformation and the sincere efforts he has made towards rehabilitation and contributing positively to society.

Since Christopher's release, he has dedicated himself to not only rebuilding his life but also enriching the lives of others around him. His commitment to positive change is evident through his commitment to the Hope for Prisoners program, attending every class, workshop and huddle-up, his consistent involvement in his children's lives, his work with the Emerald Dream Foundation, working with many different groups and individuals, including Doolittle Community Center, Pearson Community Center, Las Vegas Metropolitan Police Department Community Outreach program, and many others helping to feed and mentor at risk youth. Christopher has worked tirelessly, demonstrating an unwavering commitment to making amends and contributing to the community in meaningful ways. His actions have not gone unnoticed. Many in our community have been inspired by his dedication, hard work, and the positive attitude he maintains despite the challenges he has faced. Christopher has become a role model for others, proving that people can change and make significant contributions to society if given the chance. It is with this in mind that I respectfully request your consideration in allowing Christopher Dorsey the opportunity to start anew. He has shown remarkable resilience and a genuine desire to live a productive, law-abiding life. It is clear that Christopher is committed to making the most of this second chance, not just for himself but for the betterment of our community as a whole.

17

> I believe that society benefits more from rehabilitating and supporting those who have shown a sincere desire and effort to change than by continuing to punish them for past mistakes from which they have learned and grown. Christopher's story is one of hope, redemption, and the power of second chances….I am confident that Christopher will continue to make positive strides and contribute to our community in significant ways.

Exhibit 7.  Accordingly, in addition to his history of musical talent, Mr. Dorsey remains dedicated to helping the community and bettering others, including those who are/were incarcerated.

While special conditions restricting certain forms of post-conviction employment may be valid (if reasonably tailored to the crimes of conviction), other authority suggests that the opposite result—one that frowns upon special conditions that restrict one's livelihood—would not be warranted. *See, e.g.*, *United States v. Scott*, 270 F.3d 632, 636 n.2 (8th Cir. 2001) (citing *United States v. Cooper*, 171 F.3d 582 (8th Cir. 1999) (court abused its discretion by imposing a condition on supervised release restricting defendant's employment as an over-the-road truck driver when this bore no relationship to the offense of unlawfully transporting explosive materials many years ago)).  Here, Mr. Dorsey was not convicted of a crime related to music.  The personal dislike for the artist's lyrics by the sentencing judge allowed her personal feelings to impact her judgment. As such, it is respectfully submitted that a condition restricting his employment in the music industry is not necessary.  Rather, Mr. Dorsey can be supervised by U.S. Probation while still engaging in the music industry.  Mr. Dorsey has provided contracts, payment information, and location information.  Clearly, he has demonstrated that he can responsibly engage in self-employment in the music industry.  He has the support system and has exhibited that he is responsible.

**GOVERNMENT'S PROPOSED CONDITION NO. 4.**

> 4) Dorsey shall not travel outside the District of Nevada, where he is being supervised, without the permission of the U.S. Probation Office in that district.

This condition should be modified to state that Mr. Dorsey may travel for employment purposes. Mr. Dorsey will provide advance notice of travel as well as a travel itinerary (and check in with his supervising officer).

## MR. DORSEY DID NOT VIOLATE HIS TERMS OF SUPERVISED RELEASE

Mr. Dorsey has addressed the alleged supervised release violations in his Memorandum in Relation to alleged Supervised Release Violations filed on April 5, 2024 (ECF 173), and that Memorandum is incorporated by reference as though fully set forth herein. In the Petition, the government alleged a supervised release violation of Standard Condition No. 9 as follows:

- On February 8. 2024, Dorsey performed in a music concert, in Las Vegas, Nevada, with Torrance Hatch Jr., stage name "Lil Boosie". In 2010, Hatch was convicted of possession with intent to distribute a controlled substance and introduction of contraband in a penal institution in the state of Louisiana. On June 14, 2023, Hatch was arrested by federal agents in San Diego, California and charged with felon in possession of a firearm. Hatch's federal case is pending in the Southern District of California. Dorsey associated with a person convicted of a felony without prior permission from personnel of U.S. Probation. The Probation officer also notes that while Dorsey was residing at the Residential Re-Entry Center in Las Vegas, Nevada, he and Radric Davis, stage name "Gucci Mane" recorded an album titled "Choppers and Bricks". The album was released on December 15, 2023. In 2014, Davis plead guilty to possession of a firearm by a convicted felon in the Northern District of Georgia.

Here, Mr. Dorsey originally received permission to participate in this event from the leadership at the halfway house leadership. That cannot be reasonably disputed. <u>As such, at the time of the approval, Mr. Dorsey was under the jurisdiction of the Bureau of Prisons, and he was not on supervised release yet</u>.[5]

---

[5]     18 U.S.C. § 3624(e) governs the conditions under which a person's supervised release may begin. That section states, in pertinent part:

Specifically, Mr. Dorsey received permission for the February 8, 2024 event from the Halfway House Facility Director, Ramon Montes, and Job Developer, LaTarsha Ennis. *See also* Exhibit 3 (flyer). Mr. Dorsey obtained a contract based on this permission and he was also paid a deposit. This chronology is supported by the letter from the District of Nevada Probation Office attached to the Government's Motion as Exhibit 1. *See* ECF 180-1. Mr. Dorsey also received permission for an event on February 10, 2024 with different music artists (this event is not alleged to be a violation). *See* Exhibit 4 (flyer). Mr. Dorsey was originally supposed to have completed his halfway house time by July 2024, however, he was released early on February 1, 2024, as he received additional credits. Upon his release from the halfway house, Mr. Dorsey was also given formal approval for the February events by United States Probation Officer Annis Seopaul Sones, and her supervisor, Todd Fredlund, at an in-person meeting on or about February1, 2024/February

---

A prisoner whose sentence includes a term of supervised release after imprisonment shall be released by the [BOP] to the supervision of a probation officer who shall, during the term imposed, supervise the person released to the degree warranted by the conditions specified by the sentencing court. The term of supervised release commences on the day the person is released from imprisonment.... A term of supervised release does not run during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime....

*Id.* The Supreme Court addressed this statutory language in *United States v. Johnson*, 529 U.S. 53, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000). In *Johnson*, the defendant was convicted of several drug and firearms convictions. Id. at 55, 120 S.Ct. 1114. An appellate court later declared two of his convictions invalid, and, as a result, Johnson had over-served his remaining sentences by two-and-a-half years. *Id.* Johnson moved the trial court to reduce his term of supervised release by the excess time he had served in prison while unlawfully incarcerated. *Id.* The Supreme Court held that "a supervised release term does not commence until an individual is 'released from imprisonment.'" *Johnson*, 529 U.S. at 57, 120 S.Ct. 1114 (quoting 18 U.S.C. § 3624(e)). The Supreme Court held that "a supervised release term does not commence until an individual is 'released from imprisonment.'" *Johnson*, 529 U.S. at 57, 120 S.Ct. 1114 (quoting 18 U.S.C. § 3624(e)). Despite the fact that Johnson remained in prison beyond the period in which his supervised release should have run, the plain language of the statute requires actual release from imprisonment before a person may begin serving his term of supervised release. *Id.* at 60. In this context, the Supreme Court declared that:

A term of supervised release comes "after imprisonment," once the prisoner is "released by the [BOP] to the supervision of a probation officer." Supervised release does not run while an individual remains in the custody of the [BOP].

*Johnson*, 529 U.S. at 57, 120 S.Ct. 1114 (quoting 18 U.S.C. § 3624(e)).

2, 2024 in Las Vegas, Nevada.  Mr. Dorsey's sister, Tracey Smith, (who is also his manager), was also present for this meeting.  After the two February events, Officer Sonnes followed up with Mr. Dorsey and Ms. Smith regarding his pay for the events.  *See* Exhibit 5. There was no discussion regarding any violations.  Officer Sonnes further requested after the events in February that Mr. Dorsey not book any other concerts/hosting until U.S. Probation could address the Court regarding his conditions.  Mr. Dorsey has complied with that request.  As such, Mr. Dorsey's contact with Mr. Hatch was in accordance with permission from the leadership of the halfway house and subsequently U.S. Probation.  Accordingly, this basis for an alleged supervised release violation should be denied.  As stated above, at the hearing on March, 27, 2024, the government noted that "[t]here appears to be a communication lapse between the Court and the supervising office here in that Mr. Dorsey was granted authority from the Probation Office here to perform in some of these instances mentioned in the petition."  *See* Exhibit 1, March 27, 2024 transcript at p. 6 (emphasis added).

Furthermore, it is respectfully submitted that Mr. Dorsey should not be found in violation of this condition for recording an album with Radric Davis, stage name "Gucci Mane."  Mr. Dorsey was given approval by his case manager, Eric D. Curtis, and Halfway House Facility Director, Ramon Montes, to record said album.  This too, was a BOP halfway house approval.  As such, said album was released on December 15, 2023, prior to Mr. Dorsey being on supervised release.[6] Thus, it is respectfully submitted that this should not be considered a supervised release violation.

It should also be noted that two individuals that Mr. Dorsey performed with are successful music artists as well.  While Mr. Dorsey understands that while on supervised release moving

---

[6]     It should also be noted that Mr. Dorsey was in Las Vegas at the time of recording, and Davis was, on information and belief, recording in Georgia.  As such, they were not physically together when the album was being recorded.

forward, he needs to receive permission for any such contact, it is respectfully submitted that the contact was for employment/artistic purposes and there was no violence or illegal activity.[7]

Accordingly, Mr. Dorsey requests that this Honorable Court find that he is not in violation of this condition of his supervised release.  In said Petition, the government also alleged three violations of Special Condition No. 5.  Each alleged violation will be addressed individually. The first alleged violation states:

- On February 8, 2024, Dorsey performed in a music concert, in Las Vegas, Nevada, with Torrance Hatch Jr. stage name "Lil Boosie".  When questioned by personnel of U.S. Probation about his employment as a rapper and the need to find other employment, Dorsey responded by saying I'm a "rapper". that [is] my profession."  Dorsey failed to obtain prior written approval from the Court before entering into self-employment.

Regarding the concert with Torrance Hatch Jr., stage name "Lil Boosie", as stated above, Mr. Dorsey had permission from the leadership at the halfway house prior to being on supervised release, and he subsequently obtained permission from United States Probation as well.  As such, this basis for an alleged violation should be denied.  While Mr. Dorsey stated that he was a "rapper," he was simply relaying information as to his background.  As stated above, prior to the instant alleged violations, undersigned counsel was planning to file the attached Motion (Exhibit 2) and were also in communication with counsel for the government.  The attached Motion sets forth a legitimate basis for the Motion to be granted. Mr. Dorsey is not simply an aspiring musician/artist.  Mr. Dorsey has a history of successful music employment which predates the

---

[7]     Initially, the jurisdiction was within the BOP, as Mr. Dorsey was in the halfway house, however, when he was released, he sought and obtained permission from his supervising officer.  Mr. Dorsey proceeded with the authority granted to him from his supervising officer, believing that he was complying with the conditions of his release.   In light of these proceedings, Mr. Dorsey now understands that Court approval is necessary, and he will seek said approval in addition to continuing to have open lines of communication with his supervising officer.

instant offense.   Mr. Dorsey makes his living through music and performances.   Once his supervision expires, he will continue to be in the music industry field.

The second alleged Special Condition No. 5 violation states as follows:

- On February 16, 2024, Dorsey release a video on Youtube titled "Really Understand".  Dorsey failed to obtain prior written approval from the Court before entering into self-employment.

Regarding the posting of a music video on February 16, 2024, Mr. Dorsey was not informed by the halfway house or United States Probation that he needed Court approval to post music videos online, or that posting music videos required Court approval as "self-employment."

It should be noted that Mr. Dorsey recorded the song "Really Understand," while he was in the halfway house.  Specifically, Mr. Dorsey was given permission to go to the studio to record and attend church off the premises while on rec-time from the half-way house every weekend (since October 2023).  As such, the underlying recording was completed while Mr. Dorsey was under the jurisdiction of the BOP, and he was not on supervised release.  While the video was ultimately posted when he was on supervised release, he was not informed that this would constitute self-employment which required judicial approval.  Moving forward, absent further orders from this Honorable Court, Mr. Dorsey fully understands that he will need to seek permission to engage in self-employment conduct, such as performing in concerts or posting music videos online.  The third alleged Special Condition No. 5 violation states as follows:

- On February 24, 2024, Dorsey and Curtis Stewart, stage name, "Kidd Kidd" released a music video on Apple Music titled "Yellow Tape".  Dorsey failed to obtain prior written approval from the Court before entering into self-employment.

As stated above, Mr. Dorsey was not informed by the halfway house or United States Probation that he needed Court approval to post music videos online, or that posting music videos required Court approval as "self-employment."  Specifically, as to the video posted on February

23

24, 2024, Mr. Dorsey <u>also recorded this song while he was in the BOP's jurisdiction of the halfway</u> <u>house</u>.  It should also be noted that Mr. Dorsey appeared on this song/video for a friend of over twenty years.  The song is for the artist, Kidd Kidd, and features Mr. Dorsey.  <u>Mr. Dorsey did not</u> <u>receive any compensation for his song or video</u>; however, he may ultimately receive funds from his publishing rights.

### MR. DORSEY IS A BENEFIT TO THE COMMUNITY AND HAS CHANGED HIS LIFE FOR THE BETTER. HE IS A POSITIVE INFLUENCE AND INSPIRATION, INCLUDING FOR THOSE FROM UNDERPRIVILEGED COMMUNITIES OR WHO WERE INCARCERATED.

Mr. Dorsey would like to provide additional information to this Honorable Court regarding his recent efforts and accomplishments.  Having been released after serving his prison term, Mr. Dorsey has devoted himself to becoming a contributing and law-abiding citizen.

In addition to said employment with the Emerald Dream Foundation, Mr. Dorsey also regularly works with Jon Ponder and the Hope for Prisoners organization.[8]  Hope for Prisoners assists with reentry by providing the formerly incarcerated long-term support and services as they work to reclaim their lives, families and standing in the community.  Mr. Dorsey graduated from the Hope for Prisoners program, and he attends graduations to help hand out certificates to the new graduates.  *See* Exhibit 11.

Jon Ponder, Founder and CEO of HOPE for Prisoners, Inc., writes in part:

[[HOPE for Prisoners is a] Southern Nevada comprehensive reentry program that assists returning citizens to navigate the challenges they might face during the reintegration process. Our organization works with men, women and young adults that are exiting different arenas of our judicial system, providing training, mentoring and supportive services to assist individuals with successful reintegration back in their families, the workforce, and our community. I am writing today on behalf of Mr. Christopher Dorsey. I have had the pleasure of working with Christopher for approximately 6 months and can attest to the strength of his character and his desire to remain a productive and contributing member of our

---

[8]     https://hopeforprisoners.org/

community. He graduated from our program in September 2023 and is currently employed as the Director of Community Outreach for the Emerald Dream Foundation, despite the challenges he has faced in the past. He is determined and committed to remain on the positive path that he has chosen for his life. I am personally mentoring Christopher and am in contact with him on a nearly daily basis. I feel confident that he is not a liability to anyone, and I hope that this letter will help you in making your decision.

Exhibit 12.  As another example of Mr. Dorsey's dedication and efforts, Victor Fuchs, of Helix

Electric, writes in part:

I am reaching out to you today to discuss Christopher Dorsey, a man whose story is not just one of personal redemption but also of significant community impact. Since his release after a 13-year incarceration, Christopher has embarked on a remarkable journey of transformation that has not only reshaped his life but has also positively influenced our community in substantial ways.

Christopher's dedication to bettering himself and those around him has been evident through his numerous contributions and initiatives aimed at supporting our community's most vulnerable. The sincerity of Christopher's efforts to make amends and his dedication to public service have been truly inspiring. He has become a beacon of hope and a testament to the power of second chances, showing that with determination and support, individuals can turn their lives around and become valuable contributors to society. Christopher's story is a powerful reminder of the human capacity for growth and redemption. His actions since his release reflect a deep commitment to living a life of purpose and service. It is clear that Christopher has not only changed his trajectory but has also touched the lives of many in our community through his work.

Therefore, I humbly ask for your compassionate consideration of Christopher Dorsey's case, recognizing the profound transformation he has undergone and the positive impact he continues to make within our community. His journey represents the very essence of redemption and the positive outcomes that can emerge from providing individuals with the opportunity for a second chance, I am confident that Christopher's continued efforts will only further benefit our community, and I believe that supporting him in his journey not only serves justice but also reinforces the values of rehabilitation and community support that are central to our society.

Exhibit 13.  Cedric Crear, elected City Councilman for the Ward 5 of the City of Las Vegas, writes

in part:

I met Christopher when a local construction company called Helix, which he has performed volunteer work for, sponsored a holiday event on December 16, 2023, called "Breakfast With Santa" at the Doolittle Center.  The Doolittle Community

Center is located at 1950 J St., Las Vegas, Nevada 89106, and provides services to many at risk youth, and most importantly, encouragement to lead productive lives. During this event, I was a special guest and Christopher was "Santa." …

I am familiar with his music and realize that it often times may reflect the underside of urban life, but based on my interaction with Christopher he has showed maturity, engagement, and a real commitment to making life better for the children that he aided that day.  It is my understanding that Christopher also does additional community service work, including with the Emerald Dream Foundation.

I truly believe he will be an asset to our community moving forward and will take responsibility in the future to honor this Court's orders.

Exhibit 14 (with attached photo and flyer).  *See also* Exhibit 9 (letter from Bryan Williams, of Cash Money Records).

Accordingly, it is evident that Mr. Dorsey is sincerely dedicated to helping the community and being a positive influence on others.  Mr. Dorsey has earnestly sought to comply with the conditions and orders of this Honorable Court, including following the conditions and rules of the halfway house and United States Probation.  Contrary to the Government's assertions, Mr. Dorsey has taken his rehabilitation and supervised release conditions seriously.

## <u>CONCLUSION</u>

Mr. Dorsey respectfully requests that this Honorable Court modify the terms of his supervised release to permit him to engage in self-employment in the music industry as stated herein.

Respectfully submitted,

*/s/ William P. Gibbens*
William P. Gibbens, 27225
Ian L. Atkinson, 31605
SCHONEKAS, EVANS MCGOEY
& MCEACHIN, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Telephone: (504) 680-6050
Fax: (504) 680-6051
billy@semmlaw.com
ian@semmlaw.com

*/s/ David Z. Chesnoff*
*(pro hac vice)*
David Z. Chesnoff
Nevada Bar No. 2292
Chesnoff & Schonfeld
520 S. Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
dzchesnoff@cslawoffice.net

Attorneys for Christopher Dorsey